UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EXIDE TECHNOLOGIES | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| THE CITY OF FRISCO, FRISCO ECONOMIC | § | |
| DEVELOPMENT CORPORATION, and | § | |
| FRISCO COMMUNITY DEVELOPMENT | § | |
| CORPORATION, | § | |
| | | |
| Defendants. | | |

## EXIDE'S ORIGINAL COMPLAINT
## AGAINST FRISCO FOR BREACH OF CONTRACT

Plaintiff Exide Technologies files this complaint against Defendants the City of Frisco (the "City"), Frisco Economic Development Corporation ("FEDC"), and Frisco Community Development Corporation ("FCDC," and collectively with the City and FEDC, the "Frisco Parties"), and alleges as follows:

### NATURE OF THE ACTION

1.      Five years ago, in the face of the City's permitting delays and threats of forced closure, Exide agreed to shutter its battery recycling facility and sell much of the surrounding land to the City's two public development corporations.  The negotiated agreement was a boon to the City, trumpeted as "a tremendous opportunity in the heart of Frisco," providing approximately 180 acres of undeveloped land the City had long coveted for new development.  But while Exide works to live up to its end of the bargain, the City has embarked upon a pattern and

practice of delay and withholding that is in breach of the parties' agreement.

2.     Before the land-sale deal can close, per the parties' agreement, Exide must first complete the remediation of the undeveloped land being sold to the Frisco Parties under the Texas Commission on Environmental Quality ("TCEQ") voluntary cleanup program ("VCP").   Exide agreed that this remediation will clean lead-impacted soil to a more stringent level than required under the TCEQ's residential cleanup standard, and the Frisco Parties agreed to reimburse Exide for substantially all of the associated costs.   The Frisco Parties deposited $1 million into an escrow account for this purpose soon after the agreement was signed, but are required to deposit up to an additional $500,000 into that account if Exide, in good faith, determines that it will incur at least that much in additional costs.   The Frisco Parties and Exide agreed to share equally in any VCP remediation costs in excess of the $1.5 million.   Exide now estimates—based on assessments from qualified contractors experienced in the remediation work required—that the proper and complete remediation of that parcel to achieve the agreed upon standard will cost approximately $2.7 million.   Exide thus has requested, pursuant to the parties' agreement, that the Frisco Parties deposit an additional $500,000 into the escrow account.

3.     The Frisco Parties have refused, insisting—in the face of all competent evidence to the contrary, *including the City's own estimates*—that the work can be completed for no more than the $1 million they have already deposited.   The Frisco Parties' insistence that Exide perform the remediation on the cheap is in breach of

the parties' agreement and would otherwise jeopardize compliance with the VCP if Exide were to perform the remediation pursuant to the Frisco Parties' arbitrary cost estimates.  Remediation of this parcel will, under any reasonable estimate, cost in excess of $1.5 million.  Exide is proceeding at this very moment with the fieldwork to finalize the remediation of the undeveloped land to a cleanup level that is twice as stringent as even residential-level regulatory standards.  Exide is implementing the "Response Action Plan" that was driven by the heavily negotiated terms of the agreement between Exide and the City, and reviewed and commented on by the City prior to submission to, and approval by, the TCEQ.  The approved Response Action Plan includes many rigorous, protective measures, such as detailed perimeter air monitoring and dust control measures that must be maintained during remediation activities.  Failure to fund the necessary work is a breach of contract that demonstrates the City's intention to obstruct Exide's performance under the contract.  Despite the City's breach, Exide continues to perform fieldwork pursuant to its agreement with the City.

4.      Funding necessary agreed remediation costs is not the only area in which the City is in breach of the agreement.  The North Texas Municipal Water District (the "NTMWD") is a regional water district contracted by the City of Frisco to, among other things, process permits for wastewater discharges to the publicly owned treatment works ("POTW").  More than three years ago, Exide applied to the NTMWD for a permit necessary to discharge certain wastewater streams from the former operating plant area.  Exide had previously possessed such a permit during

and following operations, but now requires a new permit.  With the plant shut down and demolished, the wastewater proposed to be treated and discharged includes fewer streams and is of better quality prior to treatment than Exide was previously permitted to discharge.

5.     This should have been a simple and relatively quick process.  Typically such permits are issued within a few months.  Indeed, the NTMWD released a draft permit just months after Exide's December 2013 application, with an effective date of June 2014.  But the City then set about a strategy of delaying and muddling the process.  After years of prompting and requests by Exide, in late 2016 Exide was asked to submit new, additional information as an update to its long-pending application.  Exide did exactly as requested, confirmed with the water district that all technical information needed for the permit was submitted, and was advised in early 2017 that the NTMWD had a draft permit prepared that would imminently be sent to the City for final review and signature by the City's Director of Public Utilities.  This culminated with the recent proclamation by *the City*—not the water district charged with processing the permit, as would normally occur in this process—that Exide would never receive any permit.  No substantive reason has been provided for this refusal.  But whatever the reason, the result will be the continuation of unnecessary and burdensome increased water management logistics and costs to Exide.  As the parties' agreement requires the City to cooperate and assist Exide in its permitting needs, these actions are a further breach of that agreement.

6.      Exide agreed to remediate the undeveloped land under the VCP and is working in good faith to finish that work with appropriate detail and diligence. Notably, City consultants are present on-site virtually every day site work is being completed, observing, and in contact with, the Exide field personnel.  Yet the City has demonstrated an intention to obstruct closing, breached its remediation escrow funding obligations, and in bad faith has delayed the processing of, and is withholding, the City's signature on the NTMWD discharge permit.  Exide brings this action seeking judgment from this Court requiring the Frisco Parties to specifically perform their obligations under the parties' agreement, including by abiding by the agreed-upon remediation funding requirements for the undeveloped land, and assisting Exide in securing required permits—in particular the permit to discharge to the City sewer and POTW.

## PARTIES

7.      Plaintiff Exide Technologies is a manufacturer and recycler of lead-acid batteries used in a variety of settings and industries, including automotive, marine, mining, railway, telecommunications, medical, and military services, and the owner of the former lead recycling facility in Frisco, Texas.  It is incorporated in Delaware, with a principal place of business in Milton, Georgia.

8.      Defendant the City of Frisco is a home rule city organized and existing under the laws of the State of Texas.  The City may be served by serving the City Secretary, Jenny Page, at 6101 Frisco Square Boulevard, 5th Floor, Frisco, Texas 75034.

9.     Defendant the Frisco Economic Development Corporation is a non-profit corporation created by the City pursuant to the Texas Development Corporation Act, which permits municipalities to create and use a nonprofit corporation to issue bonds on the municipality's behalf and to promote and develop new and expanded business enterprises for the promotion and encouragement of employment and the public welfare.  FEDC is organized under the laws of the State of Texas, where it also has its principal place of business, and may be served by serving its registered agent, George A. Purefoy, at 6101 Frisco Square Boulevard, 5th Floor, Frisco, Texas 75034.

10.     Defendant the Frisco Community Development Corporation is also a non-profit corporation created by the City pursuant to the Texas Development Corporation Act.  FCDC is organized under the laws of the State of Texas, where it also has its principal place of business, and may be served by serving its registered agent, George A. Purefoy, at 6101 Frisco Square Boulevard, 5th Floor, Frisco, Texas 75034.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over each of the Defendants because each resides in Texas; each continuously and systematically conducts, transacts, and solicits business in Texas; each contracts with Texas residents where

either party is to perform the contract in whole or in part in Texas; and because each has committed acts in Texas giving rise to the claims in this Complaint.

13.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of property that is the subject of the action is situated in this District, a substantial part of the events or omissions giving rise to Exide's claims occurred in this District, and because the Defendants reside in this District.

## STATEMENT OF FACTS

**A.     The City works to force Exide to close its battery recycling facility.**

14.     For decades, Exide operated a battery recycling facility in Frisco, Texas, near the intersection of the Dallas North Tollway and Cotton Gin Road, where in recent years more than 130 Exide employees recycled more than 6 million batteries per year.

15.     When the facility broke ground in 1964, Frisco was a rural farming and railway community that had just cracked the 1,000-resident mark.   But as Frisco grew in recent years at an incredibly steep pace—from 33,714 residents as recently as 2000, to 116,000 in 2010, to approximately 160,000 today, and a Master Plan that anticipates reaching the 350,000 mark—the City began to view the Exide facility and its central location as an impediment to the City's future plans.   By 2006, the City was planning for the Exide facility's removal—City planning documents show a desire that the Exide land no longer be used for any industrial purpose, but instead be developed with office buildings and public open spaces.

16.     In the following years, the City manipulated its zoning ordinances and

denied permits to Exide, making it more difficult for Exide to operate, and obstructing Exide's plans to comply with federal standards.

17.     In 2011, responding to civic concerns regarding pollutants released during the battery recycling process, Exide reached an agreement in principle with the City and the TCEQ to make more than $20 million in improvements to its facility that would result in Exide exceeding newly-enacted federal standards. Exide began work to implement those improvements.

18.     But months later, the City refused to take action on Exide's applications for permits necessary to make the planned site improvements. Instead, the City Council voted to request that the City Board of Adjustment set a compliance date by which Exide would be required to cease all recycling operations, which would have legally barred Exide from using the facility for its historical and intended purpose of recycling batteries.

19.     The City and Exide both threatened litigation, but ultimately reached an agreement to resolve the matter out of court, entering into a Master Settlement Agreement (the "MSA") on June 6, 2012 that called for the shuttering of Exide's recycling facility.   In announcing the MSA, Frisco City Manager George Purefoy said:

> Exide has been a good corporate citizen of Frisco for more than four decades.  This agreement recognizes that Frisco has changed from a rural community of about 1,100 people into one of the fastest-growing, most dynamic cities in the nation, with a current population of more than 125,000 people.  This is a good business decision for Frisco that ensures a positive outcome for the City, Exide and protects the public as well as private investment around our central business district for years to come.

Exide CEO and President Jim Bolch announced the deal as follows:

> This agreement was a difficult one to make as Exide is committed to
> its employees and continuing to provide the critically important
> environmental service of recycling spent lead-acid batteries.  However,
> this agreement makes the most sense for both Exide and the City of
> Frisco to move forward.

**B.    Exide agrees to shutter its recycling facility and sell much of its land
to the Frisco Parties.**

20.    The MSA was comprehensive, and would result in great benefit to the
City and its goal of continuing to grow and develop the burgeoning neighborhood
that has grown up around the Exide land.  Exide agreed to cease operations and
conduct closure of its recycling facility in accordance with applicable regulatory
requirements, and to remediate and then sell to FCDC and FECD an approximately
180-acre tract of land surrounding the main facility site.

21.    The MSA required that no later than December 31, 2012, Exide
permanently cease all business operations on the approximately 90 acres of land
where its operating plant and landfill sat, a site referred to as the "Bowtie Parcel"
due to its shape.  Exide did so on November 30, 2012, and then set about meeting
the MSA's requirement to demolish and remove certain above-ground facilities on
the Bowtie Parcel.  Exide substantially completed this work in August 2013, and
finalized the work in January 2017.

22.    Surrounding the Bowtie Parcel is what the parties refer to as the "J
Parcel," an approximately 180-acre, undeveloped, J-shaped piece of land that had
acted as a buffer zone between the recycling facility and the surrounding properties.
Exide agreed to remediate the J Parcel soils to a standard twice as stringent as the

residential cleanup standard for lead, with the City responsible for reimbursing the costs related to that remediation.  Exide would then sell the J Parcel in two tracts to the City's two development corporations: one tract to FEDC, for a purchase price of $27,000,000, and one tract to FCDC, for a purchase price of $18,000,000, for a combined $45,000,000.  Those amounts are held in escrow along with the executed deeds until the Closing Date, which will occur after remediation of the J Parcel is complete and the TCEQ issues a confirmatory certificate referred to as a "Certificate of Completion."

23.         The following image, adapted from an exhibit to the MSA, depicts the Bowtie Parcel and J Parcel and their location within Frisco:



24.     In a letter to Frisco residents and members of the business community trumpeting the MSA, Frisco Mayor Maher Maso explained the boon to the City's development plans that would result, noting that when the deal was presented to the FEDC and FCDC those entities' board members "quickly recognized it as a tremendous opportunity in the heart of Frisco," and "consider their 180-acre land purchase a resourceful solution resulting in boundless possibilities!"

25.     Further explaining the City's plans for the J Parcel after its transfer to the FEDC and FCDC, Mayor Maso first recalled the work these entities had previously performed to "bring our community such developments as the Dr Pepper Ballpark, the Dr Pepper Arena, FC Dallas Stadium, FieldhouseUSA, Frisco Heritage Center, Frisco Discovery Center, and the future Museum of the American Railroad." He then told his constituents:

> Under FEDC and FCDC ownership, the 180-acres – particularly the tract stretching alongside the Dallas North Tollway frontage road – have potentially greater value as corporate headquarters and office space. Developing these parcels benefits Frisco, FISD and our two Collin County taxing districts. Indirectly, this move helps us maintain our low tax rate, currently one of the lowest in North Texas. The 180-acres may also be resold, developed as parks, or utilized for other city services, such as a fire training facility or municipal court. In the long run, we expect to create much more property value than the land purchase price. Additionally, we anticipate development of this property – whether by private or public parties – will ultimately translate into new jobs for our community.

26.     The parties recognized that completing all necessary tasks to get to the Closing Date would require their mutual cooperation and collaboration. Some of that cooperation and collaboration is reflected in specific terms of the MSA, dealing

with issues such as shared expenses and shared responsibilities.  For the avoidance

of doubt, each party also agreed in Section 17.1.1 to use its best efforts to do what

was necessary to facilitate the consummation of all aspects of the MSA:

> Exide and the Frisco Parties each agree to use its best efforts to take or
> cause to be taken all action, and to do or cause to be done all things
> necessary, proper or advisable under applicable Governmental
> Requirements, regulations or otherwise, to consummate and to make
> effective the transactions and other activities contemplated by this
> Agreement, including, without limitation, the timely performance of all
> actions and things contemplated by this Agreement to be taken or done
> by each party.

**C.     The Frisco Parties refuse to provide additional funds to cover costs
        Exide will incur in connection with the proper remediation of the J
        Parcel, in breach of the MSA.**

        27.     Though Exide is responsible for conducting the remediation of the J

Parcel, the Frisco Parties are, subject to cost sharing above $1.5 million, responsible

for "all costs associated with the . . . remediation of the J Parcel."  The Frisco

Parties were required, within 90 days of the MSA's execution, to deposit into an

escrow account $1,000,000 in "Remediation Funds" that "shall be disbursed to Exide

in reimbursement of the remediation costs associated with J Parcel as more fully set

out in Section 5.2 hereof."

        28.     Exide is permitted to submit requests for reimbursement from this

account on a monthly basis, after which the Frisco Parties are provided 10 days to

object to such request.  In the event any objection cannot be resolved by the parties'

business representatives, the parties are required to submit the matter to

mediation prior to pursuing litigation.  The Frisco Parties have objected to Exide's

recent reimbursement requests, which objections the parties are currently seeking

to resolve through this alternative dispute resolution process.

29.    Though the Frisco Parties were only required to make an initial $1,000,000 deposit of Remediation Funds, the parties understood and the MSA contemplated that the remediation costs could exceed that amount.   If so, the agreement requires the Frisco Parties to deposit up to an additional $500,000, after which Exide and the Frisco Parties will share equally in any further costs.  Section 5.2.2 of the MSA explains:

> If during the course of the Remediation of the J Parcel and the Lake Parcel, Exide in good faith determines that it will incur costs in excess of $1,000,000, it shall notify the Frisco Parties in writing of its estimate of additional costs.  Subject to the Frisco Parties's consent, following a good faith evaluation of Exide's estimate, the Frisco Parties shall then deposit such additional amount in the Remediation Funds Escrow Account; provided that any such additional deposits shall in no event exceed $500,000 in the aggregate.   If the costs of conducting the Remediation of the J Parcel and the Lake Parcel exceed $1,500,000, the Frisco Parties pay for one half of any such additional costs and Exide shall pay for one half of any such additional costs.

30.    In December 2016, Exide informed the Frisco Parties that, based on information received from the two contractors who were performing the J Parcel remediation work, "Exide believes the costs associated with the J Parcel remediation will total $2,706,000 . . . , which is in excess of the original $1,000,000 escrowed funds."  Exide thus requested "[p]ursuant to Section 5.2.2 of the MSA . . . that the City remit an additional $500,000 to the Remediation Funds Escrow Account."  Exide's estimate included the following components:

| Task | Contractor | Estimate |
|------|------------|----------|
| Soil Waste Characterization | Golder | $149,000 |
| Tree Survey | Golder | $25,000 |
| Monthly Reports | Golder | $5,000 |
| Remediation Oversight and Report Preparation | Golder | $369,000 |
| Tree Protection Fence | RSI | $12,000 |
| Site Preparation, Source Water Assessment and Protection, Excavation, Transportation, and Landfill Placement | RSI | $2,146,000 |
| | | **$2,706,000** |

31.    After a lawyer representing the City responded seeking additional documents supporting Exide's estimate, Exide on January 13, 2017 provided the Frisco Parties with physical copies of the estimates and quotes it had received from its remediation contractors.

32.    The City's lawyer responded on March 2, 2017, acknowledging that Exide had "provided reasonable backup" for the costs that would be incurred by the contractor performing the soil waste characterization, tree survey, monthly reports, remediation oversight, and report preparation work for Exide.  Those estimated costs total $548,000.

33.    With respect to the remaining $2,158,000 estimate for remediation work to be performed by the second contractor, the City complained that the contractor's "cost estimates are significantly greater than recent actual costs the City has paid for similar work," and listed six specific areas for which "the City needs additional, specific information on the basis of each cost estimate to

determine if RSI's cost estimates are reasonable."

34.     Exide responded on April 3, 2017, providing comprehensive written responses addressing each of the six specific costs for which the City requested additional information, along with eleven pages of spreadsheets detailing the unit costs underlying the estimate.  Exide further provided additional explanation of the basis for its own good faith determination that the estimates were appropriate, noting its own experience in these matters:

> Based on Exide's experience with remediation contractors generally, and with RSI in particular, Exide concluded that RSI has the requisite experience, expertise, staffing, equipment, and subcontracting relationships as well as specific site familiarity and background for this project.  Moreover, Exide concluded RSI's costs are reasonable and its budget estimates are appropriate for this specific project.  Accordingly, Exide engaged RSI for the J Parcel remediation work.

35.     Exide also pointed out the irrelevance of the City's reliance on costs charged by other contractors at other sites for tasks such as the clearing of debris and vegetation, excavation/disposal, placing backfill, and air monitoring, as the City provided no information about the context in which those other costs were incurred, and gave no reason to believe that those costs were relevant to the complex site remediation activities required under the TCEQ-approved VCP:

> Although you have suggested that some of the RSI cost estimates may be higher than costs the City recently has incurred on City projects, the RSI costs are reasonable for the activities being performed by RSI given site specific considerations and relevant TCEQ requirements.
>
> Further, we find without any merit your comparison to costs the City has incurred or been quoted for its own projects. The City has failed to provide any details concerning the sites you are using for comparison purposes, including complexity of work or site conditions. In fact, we believe that some or most of the dollar figures included in your letter likely do not represent a reasonable comparison to the conditions and

requirements that exist for the Exide J Parcel remediation.

36.    The MSA provides that "If during the course of the Remediation of the J Parcel . . . Exide in good faith determines that it will incur costs in excess of $1,000,000," up to an additional $500,000, "the Frisco Parties shall then deposit such additional amount in the Remediation Funds Escrow Account."  The Frisco Parties are entitled to first perform "a good faith evaluation of Exide's estimate," but otherwise must fund the additional amount.

37.    Despite this clear contractual requirement, and the significant amount of information (more than required) that Exide provided in support of its estimate, the Frisco parties refuse to meet their obligation.  In a letter dated April 6, 2017, Exide's Section 5.2.2 request was formally rejected.  The City did not respond to or address the voluminous supporting information Exide had provided days earlier, instead simply stating without substantiation that "all of the remediation activities required by the TCEQ approved VCP for the J-Parcel can be completed . . . without the necessity of additional contributions by the City."

38.    This refusal is not the result of any "good faith evaluation" by the Frisco Parties, but a blind refusal to fund the additional money required to appropriately remediate the J Parcel as required by the MSA.  This is proved by the Frisco Parties' own stated position on the matter, which is that Exide's contractor's unit costs are too high because they are higher than unit costs the City claims it recently paid others for similar tasks.  ***Even if the Exide contractor were to charge unit costs equal to those the City provided as recent examples of appropriate unit costs, the total estimate for J Parcel remediation would***

*still be well in excess of $1.5 million, at $2,097,281.*  Exide pointed this out to the Frisco Parties in its April 2, 2017 letter; the Frisco Parties have provided no justification for their refusal to fund in response.  The Frisco Parties' position that no more than $1,000,000 need be spent is made all the more absurd by their acknowledgement that Exide's estimated costs for soil waste characterization, tree surveying, remediation oversight, and report preparation work for Exide is justifiably estimated to be $548,000.  There is no basis for the Frisco Parties to contend that the balance of the work (including any costs for site preparation, source water assessment and protection, excavation, transportation, and landfill placement) may be properly performed for $452,000, less than one-third of the Frisco Parties' own estimate for that particular work.

39.    The Frisco Parties thus can have no good faith basis to decline to deposit the additional $500,000 into the escrow account, as the MSA requires them to do.  Under any known estimate, well more than that will be spent in remediation of the J Parcel.  *By arbitrarily maintaining that Exide should spend no more than $1,000,000 on the remediation, the City and the other Frisco Parties are in effect insisting that the remediation not be completed as required—a proposition Exide rejects as it continues to properly and completely implement the agreed cleanup under the approved Response Action Plan even without the agreed financial support from the City.*

40.    Exide would of course have no incentive to incur remediation costs of approximately $2.7 million if that work could instead be properly performed for $2.1

million—or less—as Exide is responsible for $0.50 out of every $1.00 spent above the $1.5 million mark.   The only rational conclusion is that Exide's estimate is reasonable, and that the Frisco Parties are either shirking their own responsibilities to ensure proper remediation of the J Parcel, or are for some reason attempting to use these funding provisions to frustrate Exide's completion of its own obligations, in breach of not only Section 5.2.2 but also of Section 17.1.1's "best efforts" requirements.

41.     Exide requests that the Frisco Parties be required to specifically perform their obligations under the MSA, and that they be ordered to deposit an additional $500,000 in the Remediation Escrow Account, and to pay 50% of all costs in excess of $1,500,000 incurred by Exide during the course of the remediation of the J Parcel.

**D.     The City is hindering and obstructing Exide's receipt of a wastewater discharge permit, in breach of the MSA.**

42.     The parties' required cooperation in connection with the wind down, demolition, and remediation activities extends to necessary permitting.   The City, specifically, is obligated to assist Exide in discussions with governmental authorities regarding necessary permits, and to assist Exide in procuring all City approvals or permits.   MSA Section 2.5 provides:

> The **City shall assist Exide in discussions with the TCEQ and any other Governmental Authority**, as requested by Exide, concerning modifications and updates required to permits and orders to recognize the wind down of operations and facility closure, but shall be under no obligation to incur any costs in doing so.   **The City shall assist Exide in procuring in accordance with city ordinances all City approvals or permits required by Exide** in connection with the Demolition Activities and the Regulatory Compliance and

Closure Activities, but shall be under no obligation to incur any cost in doing so.

43.     One of the permits Exide requires in connection with its remediation and disposal activities is an Industrial User Wastewater Discharge Permit, which will allow it to discharge wastewater meeting the permitting parameters to the City sewer and the regional wastewater treatment plant.  Exide previously had such a permit while operating its battery recycling facility, and requires such a permit to dispose of wastewater generated by its current activities in furtherance of the MSA. The new permit Exide has requested would have the same water quality requisites of the permit under which it previously operated, and require treatment and sampling for compliance prior to discharge.  Exide would be treating a higher quality influent than when it was operating (*i.e.*, well within the treatment capabilities of the existing system), and has eliminated several prior wastewater sources due to the cessation of Exide's operations and segregation of certain streams for alternate disposal.

44.     Exide applied for its Industrial User Wastewater Discharge Permit on December 10, 2013, by submitting an application to the NTMWD, which processes such permits on behalf the City.  The NTMWD is a regional body that oversees the water, wastewater, and solid waste systems and policies for 13 area cities, including Frisco.

45.     Following its review of the application, the NTMWD sent to the City a draft of the Exide permit.  That draft permit was dated to be effective June 2, 2014, indicating that the NTMWD expected the City to review and consent to the permit's

issuance by that date.

46.    But for months, the City sat on the draft permit, taking no action and requesting no additional information.   Finally, after prodding by Exide and reminder of the City's MSA Section 2.5 obligations, the City sent the NTMWD comments on the draft permit.

47.    On December 5, 2014, the NTMWD sent Exide a copy of the City's comments, and requested that Exide provide a response.   Exide did so on January 8, 2015.   It never received any reply from the NTMWD or the City, which continued to drag its heels.

48.    In the Fall of 2016, after nearly two years of waiting and prodding, Exide formally renewed its request that the NTMWD issue the permit.   This spurred the City, purportedly on behalf of NTMWD, to send Exide a further request for materials—materials that neither NTMWD nor the City had seen any need to request during the preceding 33 months the application had been pending.   Exide submitted the additional materials on November 7, 2016.

49.    Exide's application is complete (and has been for some time).   On January 20, 2017, the NTMWD confirmed to Exide that NTWMD had all of the information it needed to process the application.   On March 2, 2017, NTMWD informed Exide that it had prepared a new draft permit that it would soon submit to the City.

50.    On April 5, 2017, still having received no draft permit or other update, Exide requested a meeting with the NTMWD.   The NTMWD's response was odd,

given that NTMWD is purportedly the body that handles processing of these permits: Exide was told that it should address all further questions regarding the permit directly to the City.

51.     Exide did so, raising the issue on an April 19, 2017 call with the City. In response, the City bluntly and surprisingly informed Exide that it would never receive its permit.  The purported reason was a failure to meet City requirements, but the City would provide no further explanation.

52.     To this date, Exide has received no formal notification of any change in its application status, or any substantive explanation of why the City believes Exide will not receive its wastewater discharge permit.

53.     Whatever the reason, it is clear that the City's refusal to act on the discharge permit is unrelated to the merits of that application.  The permit Exide seeks is similar to the permit it was previously issued and operated under for years, but with *improved* influent quality that only further assures consistency and effectiveness of treatment prior to discharge.  *Nearly three years ago*, the NTMWD completed its initial review and delivered a draft permit that would permit Exide to discharge its wastewater as needed.  But at every step of the way, the City has dragged its feet and thrown up needless roadblocks.  Now, the City—not the NTMWD, the body which purportedly conducts the process—has told Exide it will not get that permit, leading to increased costs to Exide and potential delays as the company must find another way to dispose of the wastewater that will necessarily require discharge throughout the remediation process for the Bowtie Parcel.

54.    Particularly in the context of the City's other actions, it is clear that this result has nothing to do with the permit application itself and is instead part of a strategy to delay and impede Exide's access to the funds that were intended to compensate it for the shutdown of its facility and the transfer of valuable land.  This is a strategy Exide has seen before, as the City used similar methods not long ago to exert pressure on Exide to shutter its facility and sell the land to the Frisco Parties. The City's obstructive actions are in breach of its obligations under Sections 2.5 and 17.1.1 of the MSA to *assist* Exide in this process.

55.    Exide requests that the City be required to specifically perform its obligations under the MSA with respect to its application for an Industrial User Wastewater Discharge Permit submitted to the NTMWD, including through providing all due assistance and cooperation in Exide's procurement of that permit.

## CLAIMS AND CAUSES OF ACTION

56.    Each of the following claims for relief is based on and incorporates the preceding paragraphs by reference as if fully set forth herein.

### FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT

57.    Exide and the Frisco Parties are parties to the MSA, which is a valid and enforceable contract.

58.    Exide has performed and/or tendered performance of its obligations under the MSA.  All conditions precedent to those obligations the Frisco Parties have breached have been performed or have occurred.

59.    The Frisco Parties have engaged in a pattern and practice of behavior

that is in breach of the MSA, including in the following respects: the Frisco Parties have, in refusing to deposit an additional $500,000 in the Remediation Funds Escrow Account following Exide's good faith determination that it will incur J Parcel remediation costs in excess of $1,500,000, breached the MSA, including Sections 5.2.2 and 17.1.1; and the City, through its obstructive actions and inaction in relation to Exide's NTMWD permit application, has breached the MSA, including Sections 2.5 and 17.1.1.

60.     Exide has suffered injury as a result of the Frisco Parties' actions, in an amount in excess of the jurisdictional requirements of this Court.  Because in the MSA "the Parties expressly agree[d] that the failure of any Party to perform its obligations under this Agreement shall entitle the other Party to seek and obtain, as its sole and exclusive remedy against a non-performing Party for breach of this Agreement, specific performance of all such non-performed obligations," Exide has no adequate remedy at law, and cannot be adequately compensated with damages. Exide is ready, willing, and able to timely perform its obligations under the MSA. Exide thus requests that the Frisco Parties be required to specifically perform their obligations under the MSA, including through (1) the deposit by the Frisco Parties of an additional $500,000 in the Remediation Escrow Account, and the payment of 50% of all costs in excess of $1,500,000 incurred by Exide during the course of the remediation of the J Parcel; and (2) the City providing all due assistance and cooperation in Exide's procurement of its Industrial User Wastewater Discharge Permit processed by the NTMWD and signed by the City.

61.   Exide is also entitled to its reasonable attorney's fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

## REQUESTED RELIEF

Exide requests the following relief:

A.   That the Frisco Parties be required to specifically perform their obligations under the MSA, including through (1) the deposit by the Frisco Parties of an additional $500,000 in the Remediation Escrow Account, and the payment of 50% of all costs in excess of $1,500,000 incurred by Exide during the course of the remediation of the J Parcel; and (2) the City providing all due assistance and cooperation in Exide's procurement of its Industrial User Wastewater Discharge Permit processed by the NTMWD and signed by the City.

B.   That Exide recover its costs in this civil action, as well as its reasonable and necessary attorney's fees and expenses, and pre- and post-judgment interest on those costs, fees, and expenses.

C.   That Exide be awarded such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By      _s/ Van H. Beckwith_
       Van H. Beckwith
       Texas State Bar No. 02020150
       John B. Lawrence
       Texas State Bar No. 24055825
       BAKER BOTTS L.L.P.
       2001 Ross Avenue, Suite 700
       Dallas, Texas 75201
       Telephone:  214-953-6500
       Facsimile: 214-953-6503
       van.beckwith@bakerbotts.com
       john.lawrence@bakerbotts.com

       ***Counsel for Plaintiff***
       ***Exide Technologies***